UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHANELL GILLIN ON BEHALF OF L.L.L. | * | CIVIL ACTION NO. 17-9188 |
| | * | |
| VERSUS | * | SECTION: "F"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE MARTIN L. C. FELDMAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *************************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Shanell Gillin on behalf of the minor L.L.L., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying L.L.L.'s claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3). The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 12) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 13) be GRANTED. It is further RECOMMENDED that the Motion to Submit New Evidence (Rec. Doc. 14) be DENIED.

**Procedural Background**

L.L.L. applied for SSI on August 6, 2014, asserting a disability onset date of August 1, 2014. He alleged the following illnesses, injuries, or conditions:  asthma, bronchitis, stridor, and growth problems. On November 5, 2014, his claim was denied by the state agency. L.L.L. obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 9, 2016. On June 20, 2016, the ALJ issued an adverse decision. L.L.L.'s counsel withdrew

from representation on August 19, 2016. L.L.L. timely appealed to the Appeals Council, which denied review on August 9, 2017.

On September 18, 2017, L.L.L. filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 8, 9). The parties filed cross-motions for summary judgment. (Rec. Docs. 12, 13). L.L.L. moved to submit new evidence into the record on March 14, 2018. (Rec. Doc. 14). The Commissioner opposed. (Rec. Doc. 16). L.L.L. is not represented by counsel.

## Evidence in the Record

*Testimony*

A hearing was held before the ALJ on May 9, 2016. R. at 97. Claimant was represented by attorney Joseph Williams. R. at 99. The claimant's mother, Chanel Gillin, testified. R. at 101. L.L.L. was present at the beginning of the hearing. R. at 101. He was two years old. R. at 102. The ALJ spoke to him, saying "hi. Mr. L[], hi, L[]. Can you look at me? L[]? Mr. L[]?" R. at 101. The claimant's attorney had no questions for him. Id. When later asked about L.L.L.'s interaction with the ALJ, Ms. Gillin said that L.L.L. did not have hearing problems and that he mostly understands what she is saying. R. at 111.

Ms. Gillin testified that L.L.L. and his twin brother were born prematurely and spent about three weeks to a month in an incubator. R. at 103. L.L.L. had difficulty eating and breathing. R. at 103. Since that time, L.L.L. has developed acid reflux and seasonal allergies. R. at 104. The reflux causes him to choke when he lays down, and Ms. Gillin testified that he chokes almost every night. R. at 104. He is supposed to sleep with his head elevated, but does not stay elevated while he sleeps. R. at 104. Ms. Gillin testified that L.L.L. throws up two or more times a week. R. at 109-10.

Ms. Gillin testified that L.L.L. still has problems eating. R. at 105. He cannot use his utensils to eat because he cannot pick up small objects. R. at 105. He cannot chew well, so he typically eats mashed potatoes or oatmeal. R. at 105. He can drink out of a sippy cup without problems, but is not drinking out of a regular cup. R. at 106.

Ms. Gillin testified that L.L.L. gets short of breath when he is running around and playing with his brother. R. at 106. He also has problems breathing when he is sick. R. at 108. He takes two to three breathing treatments a day. R. at 108.

L.L.L. plays with his twin brother at home, but they do not play with their older sister, who was five at the time of the hearing. R. at 107. When L.L.L. and his brother play, they like to roll trucks and cars on the floor. R. at 109. Ms. Gillin testified they might play for about three minutes before moving on to something else. R. at 113. She testified that they also pull out baby wipes or unroll the toilet paper. R. at 113. L.L.L. naps during the day about three times per week. R. at 113.

Ms. Gillin testified that L.L.L. does not speak or otherwise make himself understood to her or his twin brother. R. at 108. But she explained that when L.L.L. and his twin brother play, they babble and seem to be speaking their own language to each other, which she cannot understand. R. at 112. She was not sure whether they could understand each other. R. at 112. Ms. Gillin later testified that L.L.L. understands her directions about fifty percent of the time. R. at 115.

When asked by L.L.L.'s counsel, Ms. Gillin testified that L.L.L. does not do normal things that children his age do. R. at 110.

The ALJ discussed L.L.L.'s recent medical treatment with Ms. Gillin. R. at 113. She said she knew he had been to the emergency room in the last year, but she could not remember when. R. at 113. He had been admitted with Respiratory Synctial Virus ("RSV"). R. at 116. L.L.L.'s most recent treatment was his two year old check-up, when it was discovered L.L.L. had an ear infection.

3

R. at 113-14. Ms. Gillin testified that a development evaluation had been performed. R. at 114. She said the pediatrician recommended a sleep study due to L.L.L.'s breathing issues. R. at 114. She said that L.L.L. stops breathing in his sleep. R. at 115. An appointment with an ear, nose, and throat specialist was also recommended for his seasonal allergies. R. at 114. She testified that L.L.L. had visited the pediatrician about five or six times over the previous year. R. at 119. She testified that he sees a therapist with Early Steps twice a week, but had not seen other specialists over the previous year. R. at 116.

Ms. Gillin said she has seen no improvement with his therapy at Early Steps. R. at 116. She reported that L.L.L. had been approved for another year of therapy with Early Steps because he was not speaking yet. R. at 116. He would be seeing his regular therapist and a speech therapist. R. at 117.

*Medical Records*

L.L.L. was born prematurely on March 13, 2014. R. at 237. He was born at 34 weeks with respiratory distress. R. at 243. He remained hospitalized until April 2, 2014. R. at 237. A chest x-ray and KUB (kidney, ureter, bladder) babygram was performed on March 13, 2014. R. at 247. Impressions were: no radiographic evidence of acute cardiopulmonary process, nonobstructive bowel gas pattern with no evidence of pneumoperitoneum, enteric tube in radiographically satisfactory position. R. at 247. Cranial sonographic images were taken on March 31, 2014, and the results were normal. R. at 245. On April 2, 2014, a Brainstem Auditory Evoked Response Study was performed. R. at 242. Results were normal. R. at 242. A physical examination was performed on April 2, 2014, at the time of discharge. R. at 282-83. L.L.L. had equal breath sounds in all lung fields, no crackles, rubs, or wheezing, and was breathing comfortably. R. at 283.

4

L.L.L. visited Dr. Heath Bettencourt at the Growing Up Children's Clinic on May 1, 2014, for a checkup. R. at 287. He was gaining weight well, and upon physical examination all systems were normal. R. at 287.

L.L.L. returned to Dr. Bettencourt's office on May 6, 2014, complaining of cough and congestion. R. at 276. He was prescribed Proline syrup, and use of a humidifier and nasal saline drops was recommended. R. at 276. When he returned for a follow up on May 9, 2014, he was noted to be doing better, but a little fussy. R. at 274.

On May 16, 2014, L.L.L. returned to Dr. Bettencourt with complaints of cough, congestion, and wheezing. R. at 273. It was noted that he had been diagnosed with croup ten days earlier, but still had a cough, congestion, and intermittent stridor. R. at 273. It was noted he was "eating like normal" and was gaining weight. R. at 273. Upon physical examination, mild tachypnea, intermittent wheezing, and rhonchi were noted. R. at 273. L.L.L. was assessed with bronchitis. R. at 273. He was prescribed Albuterol, along with a nebulizer, mask, nebulizer kit, and filter. R. at 271.

L.L.L. had his 2 month "well visit" with Dr. Bettencourt on June 2, 2014. R. at 286. Upon physical examination, all systems were normal. R. at 286.

On July 2, 2014, L.L.L. presented at Dr. Bettencourt's Growing Up Children's Clinic with congestion, a cough, and a runny nose. R. a 270. He tested negative for pertussis. R. at 268-70. He was prescribed Azithromycin and use of a humidifier was recommended. R. at 270.

L.L.L. had an appointment on July 30, 2014, for an initial evaluation with Dr. Stephen Nelson, a pediatric neurologist. R. at 235. L.L.L. had been referred by his pediatrician for developmental delay. R. at 236. Current development was noted as "cooing, smiling, laughing, standing with support, lifts head when prone, starting to roll, feeding well with formula + small

amount of rice cereal." R. at 235. Upon a review of systems, L.L.L. was assessed positive for stridor, no regression or loss of skills, no seizures, no fussiness, and no choking or gagging. R. at 236. L.L.L. was assessed with laryngeal stridor, premature infant with gestation of 30-35 weeks, umbilical hernia, and infantile hypertonia. R. at 237. He was referred to Early Steps and an otolaryngologist. R. at 237. The umbilical hernia would be monitored. R. at 238.

L.L.L. visited Dr. Bettencourt for his five month well baby visit on August 13, 2014. R. at 285. Upon physical examination all systems were normal. R. at 285. It was also noted that he smiles, coos, laughs, rolls over, and reaches out hands. R. at 285. A history of laryngeal stridor was noted and L.L.L. was referred to an ENT. R. at 285. He was also referred to Early Steps. R. at 285.

On August 21, 2014, Dr. Sohit Kantora, reported to Dr. Bettencourt that L.L.L. had been seen at the ENT Clinic at Children's Hospital that day. R. at 264. Dr. Kanotra noted that L.L.L. had a history of stridor since birth that was getting worse day-by-day. R. at 264. L.L.L. was five months at the time. R. at 264. It was noted there were no feeding issues and L.L.L. was gaining weight. R. at 264. Dr. Kantora noted that upon examination, L.L.L. was otherwise healthy with no apparent dysmorphic features. R. at 264. A flexible laryngoscopy was performed showing a small adenoid pad, a tubular shaped epiglottis, tight AE folds and severe reflux along with edema of the arytenoids. R. at 264. L.L.L. was started on Prevacid for laryngomalacia with laryngopharyngeal reflux. R. at 264.

L.L.L. presented at the Children's Hospital Emergency Department on September 3, 2014, complaining of difficulty breathing, runny nose, and congestion. R. at 336. It was noted that he was using Albuterol 1 to 2 times per month. R. at 336. He was not wheezing. R. at 337. He was

diagnosed with reactive airway disorder ("RAD"), rhino/enterovirus, and reflux. R. at 340. He was discharged on September 5, 2014, in stable condition. R. at 340.

L.L.L. had an appointment on September 15, 2014, with Dr. Bettencourt for a six-month well visit. R. at 263. On physical examination, he was normal except for congestion and wheezing. R. at 263.

L.L.L. returned to the Children's Hospital Emergency Department on September 18, 2014. R. at 357. L.L.L. had started wheezing the previous night and had a couple of pauses in breathing while asleep. R. 357. He was refusing a bottle. R. at 357. The physician noted that after suctioning, L.L.L. was able to finish a bottle. R. 357. He was discharged the same day with instructions to use saline drops and suctioning as needed before feeding and sleeping. R. at 360. His parents were also instructed to provide albuterol nebulizer treatment three to four times per day as needed. R. at 360.

A consultative examination was performed on October 29, 2014, by Margaret J. Hauck, Ph.D. R. at 343. It was noted that L.L.L.'s parents were the informants and were deemed reliable. R. at 343. The examiner observed that L.L.L. was cuddly, reached and scooted for toys and was very interested in his surroundings. R. at 344. His breathing was "loud and labored" and "very unusual compared to the numerous infants" the examiner had evaluated. R. at 344. L.L.L. seemed to have trouble babbling "because it was hard for him to make sounds around his need to breathe and he often seemed to run out of air when he working on getting around the office." R. at 344. The examiner noted that L.L.L.'s eye contact, demeanor, and social interactions were age appropriate. R. at 344. His mood was cheerful and he displayed a full range of typical affect for his age. R. at 344. The examiner performed a Bayley examination. R. at 344-45. The examiner found he showed a strength in cognitive skills, "suggesting his development of nonverbal abilities is on track." R. at 345. But, but his language skills were a significant weakness and area of concern.

R. at 345. His motor skills were found to be on track. R. at 345. His social-emotional skills were very mildly delayed. R. a 345. And his adaptive skills were found to be on track or mildly delayed. R. at 345. The examiner concluded that L.L.L. was "developing at or close to the level expected given his age as **corrected for prematurity** in cognitive abilities, motor skills, and adaptive skills. He is lagging mildly on social-emotional development and showing significant delay in language development." R. at 345 (emphasis in original). The examiner also concluded that L.L.L.:

> Would have difficulty in the following areas: staying on task for an age-appropriate amount of time; having age-appropriate amount of energy and being able to breathe well enough to work on and master skills (especially motor tasks and tasks requiring sustained alertness): communicating with others (due to language delay). He would be able to engage in age-level social interchanges and solve age-level tasks and problems as long as he was breathing well enough to work on a task.

R. at 345.

L.L.L. returned to the Children's Hospital Emergency Department on November 1, 2014, complaining of a cold and cough that had become worse in the last 24 to 48 hours. R. at 363. The medical provider noted that L.L.L. was sleeping comfortably with upper airway noise, but no wheezing. R. at 369. His breathing was unlabored. R. at 364. He was diagnosed with rhino/enterovirus. R. at 365. He was prescribed albuterol nebulizer treatments to be given every four to six hours as needed for wheezing. R. at 365. He was discharged on November 2, 2014. R. at 365.

L.L.L. returned to the Children's Hospital Emergency Department on February 4, 2015, complaining of cough and congestion. R. at 369. It was noted that his breathing was unlabored and his breath sounds were clear. R. at 371. There was upper airway noise, but no wheezing. R. at 369. He was diagnosed with RSV and bronchiolitis and instructed to use bulb suction for the nose as needed and to continue albuterol treatments. R. at 372. He was discharged the same day. R. at 372.

L.L.L. returned to the Children's Hospital Emergency Department on March 21, 2015, complaining of reflux. R. at 373. Spitting up seemed worse since starting whole milk two weeks earlier. R.at 373. It was noted that L.L.L. was playful, smiling, and happy. R. at 373. He was discharged with instructions to continue Prevacid. R. at 376.

L.L.L. returned to Children's Hospital Emergency Department a week later on March 28, 2015, complaining of nasal congestion, fever, and cough. R. at 377. His breathing was unlabored. R. at 379. His breath sounds were coarse, but with no wheezing. R. at 379. He was diagnosed with viral respiratory illness. R. at 377. He was discharged the same day with instructions to suction nose with saline drops before feeding and as needed, to provide acetaminophen and ibuprofen for fever, and to follow up with his primary care physician in two days. R. at 380.

L.L.L. returned to Children's Hospital Emergency Department on December 5, 2015, complaining of fever, cough, and congestion. R. at 381. His breathing was unlabored, and his breath sounds were coarse. R. at 383.  "[S]ome wheezing in the past," was also noted. R. at 381. He was diagnosed with RSV and discharged on the same day. R. at 384.

On December 18, 2015, Dr. John K. Willis, with New Orleans Medical Center Pediatric Neurology, submitted a report to L.L.L.'s primary care physician Dr. Bettencourt reporting that he had seen L.L.L. for three paroxysmal episodes in the preceding six months. R. at 385. Each episode began with L.L.L. becoming angry (e.g., toy taken away), beginning to cry vigorously, then holding his breath and losing consciousness for a few seconds and then going sleep. R. at 385. Dr. Willis observed that L.L.L. had appropriate orientation, attention, language, knowledge, and memory for his age. R. at 386. Dr. Willis reported that L.L.L.'s vision, hearing, speech, swallowing, strength, and coordination were normal. R. at 385-86. L.L.L. could walk and speak a few words. R. at 386. L.L.L. was determined to be neurologically intact. R. at 386. Dr. Willis

explained that the breath-holding episodes were typical and benign and that L.L.L. would outgrow them. R. at 386. Dr. Willis suggested L.L.L. have his blood checked for a possible iron deficiency. R. at 386.

A Functional Assessment form was completed by L.L.L.'s pediatrician, Dr. Heath Bettencourt, on March 23, 2016. R. at 231-33. Dr. Bettencourt was unable to assess L.L.L. in the categories of "acquiring and using information" and "attending and completing tasks" due to L.L.L.'s age. R. at 231. Dr. Bettencourt assessed L.L.L. as having an impairment of "less than moderate" in the categories of "interacting and relating with others" and "moving about and manipulating objects." R. at 231. Dr. Bettencourt noted that L.L.L. was "shy, afraid of other people" and "doesn't like to play with children he doesn't know." R. at 232. Dr. Bettencourt also noted that when walking, L.L.L.'s mother reports that he often falls and that he can use his hands to feed himself, but mother says she usually feeds him. R. at 232. Dr. Bettencourt found no evidence of limitation in "personal care" noting that L.L.L's mother bathes and diapers him. R. at 232. Dr. Bettencourt assessed L.L.L. as having a "moderate" limitation in the category of "health and physical well-being."

*Early Steps Evidence*

L.L.L. was first evaluated by Early Steps in April 2014. The "2 Month" Ages and Stages Questionnaire ("ASQ") was performed on April 14, 2014. For gross motor, fine motor, and problem solving, L.L.L. scored above the cutoff. For communication and personal/social, L.L.L. scored close to the cutoff. R. at 323. He was determined not eligible for Early Steps. R. at 317.

L.L.L. returned to Early Steps in August 2014. The "6 Month" ASQ was performed on August 15, 2014, and L.L.L. scored above the cutoff for communication, near the cutoff for gross motor and fine motor, and below the cutoff for problem solving and personal/social. R. at 310. An

activity based interview was conducted on August 26, 2014. R. at 311. In the "social interactions/play" section, it was noted that L.L.L. would pay attention to the TV for five minutes, likes cell phones, plays with feet, and vocalizes. R. at 314. It was noted that he looks at adults' faces and cries to get needs met. R. at 314. It was again determined that L.L.L. was ineligible for Early Steps. R. at 296.

L.L.L. was again assessed by Early Steps in March 2015. A "14 Month" ASQ was performed. R. at 395. L.L.L. scored below the cutoff in communication, gross motor, fine motor, problem solving, and personal-social. R. at 400. The Early Steps Report for IFSP and Program Planning reported that a Battelle Development Inventory-2 (BDI-2) was performed and L.L.L. demonstrated below age level skills in communication and adaptive domains. R. at 405. His motor and cognitive skills were in the low average range and his social skills were in the average range. R. at 405. The Early Steps report notes that L.L.L. could take some foods from a spoon, suck and swallow well, and hold his own bottle. R. at 406. But he was not yet using words during his routine, feeding himself with his hands, or chewing well. R. at 406. His social skills included showing a range of understanding, an understanding of routines, and interactions with family members. R. at 406. His receptive communication skills included being able to pay attention during conversation, respond to tone of voice, and follow some visual directions with lots of visual cues, but he was not yet following direction consistently, looking for named people, or paying attention to longer portions of communication. R. at 406. His expressive communication skills included using some simple blends, but he was not yet using at least five simple words during his day. R. at 406. His gross motor skills included pulling to stand and walk, but he was not yet standing or walking independently for long periods. R. at 406. His fine motor skills included throwing objects, using a pincer grasp, and dropping with purpose. R. at 406. His cognitive skills included being able to play

independently, explore his area, and watch during peekaboo. R. at 406. A team meeting was held on April 28, 2015, and L.L.L.'s parents were informed that he qualified for Early Steps based on low scores in communication and adaptation. R. at 401. The Early Steps report noted the following goals for L.L.L.: walk without assistance, use words with purpose, bite and chew during meal time, and show understanding of language. R. at 406. A six month review was conducted on October 20, 2015, and all goals were kept the same. R.at 432.

Following the ALJ's adverse decision, additional records from Early Steps and the Orleans Parish School Board ("OPSB") were submitted. The Early Steps records include monthly progress reports for January, March, April, May, and June 2016. R. at 38-47. In each progress report, it was noted that L.L.L. was making slight progress towards his gross motor, fine motor, and feeding goals. Id. Each progress report noted that during floor activities involving toys, L.L.L. actively participated, but had difficulty remaining focused on task. Id.

The Early Steps records submitted to the Appeals Council also include an Early Steps Report dated May 2, 2016. R. at 78. The report notes that L.L.L. had been receiving occupational therapy four times a month. R. at 78. It was noted that he "appears to be in overall good physical health." R. at 78. His mother reported that L.L.L. was "making definite progress," but continued to warrant support in the area of physical mobility and fine motor skills. R. at 78. His mother also remained concerned with his communication skills and overall behavior. R. at 78. She noted that L.L.L. is capable of following simple, routine commands and directions, but verbal prompting and physical redirection is often necessary for compliance. R. at 78. L.L.L. could remove his socks and shoes independently, and his mother reported that he displayed moments of independence when motivated to complete a task. R. at 80.  A BDI-2 was completed. R. at 79. L.L.L. demonstrated personal social behaviors in the range of low average, adaptive skills and cognition in the range of

mild developmental delay, and communication in the range of significant developmental delay. R. at 79. L.L.L. was demonstrating age appropriate skills for his age group in 1 out of 5 tested domains. R. at 79. L.L.L. was able to identify some simple common objects and recognize object functions. R. at 81. He did not display any openness toward unfamiliar people following parental prompting. R. at 81. The report concluded that L.L.L. continued to qualify for Early Steps. R. at 81. The following goals were set for L.L.L.: begin to use utensils in a more coordinated manner during meals; improve grab and release of small objects at an appropriate level; and begin to state five to ten single words three times a day for seven days. R. at 89-91.

The Appeals Council did not consider or "exhibit" the Early Steps evidence that was already in the record, nor did the Appeals Council consider the remaining Early Steps evidence, finding that it did "not show a reasonable probability that it would change the outcome of the decision." R. at 2.

The OPSB records submitted to the Appeals Council include a report of L.L.L.'s initial evaluation that was issued on January 30, 2017. R. at 49. The OPSB evidence also includes an Individualized Education Program ("IEP") dated February 17, 2017, and an Assistive Technology Consideration Checklist of the same date. R. at 64. The Appeals Council did not consider the OPSB records dated January 30, 2017 through April 2, 2017, because the Appeals Council found this evidence did not pertain to the period at issue since the ALJ had decided the case through June 23, 2016. Id.

### Decision of the Administrative Law Judge

The ALJ found that L.L.L. was born on March 13, 2014, and was classified as an "older infant" on the date the application was filed and on the date of decision. The ALJ determined that L.L.L. had not been engaged in substantial gainful activity since August 6, 2014. The ALJ

determined that L.L.L. has the following severe impairments: laryngomalacia with laryngopharyngeal reflux; asthma/reactive airway disease; and developmental delay/communicative language disorder. The ALJ determined that L.L.L. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. In coming to this conclusion, the ALJ considered Listing 103.03, Asthma; Listing 105.08, Growth Failure due to any digestive disorder; and Listing 112.02 for children, which is used to evaluate learning disabilities.

The ALJ next determined that L.L.L. does not have an impairment or combination of impairments that functionally equals the severity of the alleged listing. In making this determination, the ALJ considered the record and each of the six functional equivalence domains. The ALJ found that L.L.L. has less than marked limitation in acquiring and using information; less than marked limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; less than marked limitation in the ability to care for himself; and marked limitation in health and physical well-being.

Thus, the ALJ concluded that L.L.L. has not been disabled since August 6, 2014, the date the application was filed.

### Statement of Issues on Appeal

Issue No. 1.     Does the supplemental evidence submitted by the claimant justify a remand to the ALJ?

Issue No. 2     Whether the decision of the ALJ is supported by substantial evidence.

## Analysis

### I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

### II.    Entitlement to Benefits under the Act.

A child under the age 18 is "disabled" under the Act if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe

functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; see 20 C.F.R. § 416.924. It is the claimant's burden to prove that he meets the definition of disabled. Fraga v. Bowen, 810 F.2d 1296, 1301–02 (5th Cir. 1987).

The ALJ employs the following three-step sequential process in evaluating childhood disability cases:  (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a severe impairment or combination of impairments; and (3) whether the severe impairment(s) meets, medically equals, or functionally equals the severity of any impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.924(a)-(d). In evaluating functional equivalence at step three, the ALJ considers how a child functions in his activities in terms of six domains of functioning. 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. Id.  Functional equivalence means that the impairment is of listing-level severity and results in "marked" limitations in two of the six domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(2).   An "extreme" limitation interferes *very* seriously with the child's ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(3) (emphasis added).

The regulations require use of the "whole child" approach, which means that before analyzing each domain, the decision maker first considers how the child's functioning is affected during all of the child's activities. 20 C.F.R. § 416.926a(b); Id. § 416.926a(c)   Title XVI:

16

Determining Childhood Disability Under the Functional Equivalence Rule-the "Whole Child" Approach, SSR 09-1P (S.S.A. Feb. 17, 2009). As explained in the regulations,

> Any given activity may involve the integrated use of many abilities and skills; therefore, any single limitation may be the result of the interactive and cumulative effects of one or more impairments. And any given impairment may have effects in more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s).

20 C.F.R. § 416.926a(c).

## I.    Plaintiff's Appeal.

### Issue No. 1.    Does the supplemental evidence submitted by the claimant justify a remand to the ALJ?

New evidence was submitted on L.L.L.'s behalf in conjunction with L.L.L.'s Motion for Summary Judgment. That evidence includes L.L.L.'s pre-kindergarten report card from the Audubon Charter School for the first trimester of the 2017-2018 school year; L.L.L.'s IEP dated November 13, 2017, and an Assistive Technology Consideration Checklist. On March 14, 2018, L.L.L. filed a Motion to Submit New Evidence (Rec. Doc. 14), and attached an IEP Progress Report dated February 28, 2018; an IEP Progress Report dated March 9, 2018; an IEP Progress Report dated March 7, 2018; and L.L.L.'s pre-kindergarten report card from the Audubon Charter School for the second trimester of the 2017-2018 school year.

As the Commissioner points out, this new evidence is not part of the administrative record. This Court is precluded from issuing "factual findings on new medical evidence." Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989). Instead, the Court's review "is limited to determining whether to remand for the consideration of the newly presented evidence." Id. "To justify a remand, 42 U.S.C. § 405(g) requires that the evidence is 'new' and 'material'" as well as a showing of 'good cause' for failing to provide this evidence at the original proceedings." Ripley

v. Chater, 67 F.3d 552, 555 (5th Cir. 1995). Good cause requires a proper explanation of why the new evidence was not submitted earlier. Geyen v. Secretary, 850 F.2d 263, 264 (5th Cir.1988). Evidence is material if there is "a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985). Additionally, to satisfy materiality, the new evidence must "relate to the time period for which benefits were denied, and [must] not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).

The evidence submitted by L.L.L. with the Motion for Summary Judgment and with the Motion to Submit New Evidence all pertains to L.L.L.'s performance and condition during the 2017-2018 academic year. This time period is over a year after the ALJ's decision on June 23, 2016. Because the evidence does not concern the time period for which benefits were denied, it cannot be material and cannot justify remand. Accordingly, the undersigned recommends denial of the Motion to Submit New Evidence and does not consider the 2017-2018 evidence in assessing the ALJ's decision below.

### Issue No. 2.     Whether the decision of the ALJ is supported by substantial evidence.

The claimant is proceeding pro se through his mother. The Motion for Summary Judgment filed on L.L.L.'s behalf does not raise a specific error, but instead describes L.L.L.'s current condition. [1] For example, she says that he is not yet potty trained and cannot write or color, read pictures, do puzzles, or throw or catch a ball. She notes that L.L.L.'s asthma has been controlled

---

1 As noted above, the Motion for Summary Judgment included L.L.L.'s school records for the 2017-2018 school year, which is outside of the period of this Court's review. It seems L.L.L.'s mother's argument may be focused on L.L.L.'s more recent performance. As noted by the Appeals Council when considering evidence from late 2016 and early 2017 that Ms. Gillin submitted to the Appeals Council, if Ms. Gillin wants a determination of whether L.L.L. is disabled after June 23, 2016, L.L.L. needs to apply for benefits again.

by his nebulizer and albuterol and that he takes medication for allergies and acid reflux. She argues that L.L.L. is not performing at an age appropriate level and urges that benefits be awarded. The Court thus considers whether the ALJ's decision is supported by substantial evidence. As discussed below, the undersigned finds that the ALJ's decision is supported by substantial evidence and should not be reversed.

a. _Conclusion that L.L.L. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments._

In concluding that L.L.L. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, the ALJ considered Listing 103.03, Asthma; Listing 105.08, Growth Failure due to any digestive disorder; and Listing 112.02 for children, which is used to evaluate learning disabilities.

To establish a disability under Listing 103.03, the claimant must have:

A. FEV equal to or less than the value specified in table I of 103.02A; OR
B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours to control asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks; OR
C. Persistent low-grade wheezing between acute attacks or absence of extended symptoms-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
   1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
   2. Short courses of corticosteroids that average more than 4 days per month for at least 3 months during a 12-month period; OR
D. Growth impairment as described under the criteria in 100.00

20 C.F.R. § Pt. 404, Subpt. P, App. 1, §103.03. An "attack" is "defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator, antibiotic administration or prolonged inhalational bronchodilator therapy in a

hospital, emergency room or equivalent settings." Id. § 3.00C. A growth impairment under 100.00 is described as failure to thrive and is documented by three weight-for-length measurements in a twelve month period, at least 60 days apart, of less than the third percentile on the appropriate weight for length table if the child is under 2. Id. § 100.05.

The ALJ found that L.L.L. did not satisfy the FEV1 values of Table I of 103.02A; that the medical evidence does not document attacks requiring physician intervention occurring at least once every two months or at least six times per year in spite of prescribed treatment; and that L.L.L. had not demonstrated persistent low-grade wheezing or growth impairment. These findings are supported by the record. There is no record of any spirometry testing or FEV values in L.L.L.'s medical records. Thus, L.L.L. does not satisfy subparagraph A.

There is also no evidence that L.L.L. suffered from attacks occurring at least once every 2 months or at least six times a year. L.L.L. was hospitalized for over 24 hours with complaints of difficulty breathing in September 2014. He returned to the hospital with complaints of wheezing and pauses in breathing on September 18, 2014. Although he returned to the hospital in November 2014, February 2015, and late March 2015 complaining of congestion and/or cough, these visits do not appear to involve complaints of wheezing or difficulty breathing. Indeed, his breathing was unlabored at all three visits. Even assuming the first hospitalization in September 2014 counts as two attacks and the later visit in September 2014 counts as one, the medical record does not show attacks once every 2 months or at least six times a year.

The evidence also fails to show persistent wheezing. Wheezing was noted by Dr. Bettencourt on May 16, 2014, and September 15, 2014. But Dr. Bettencourt did not observe wheezing on May 1, 2014, May 6, 2014, June 2, 2015, July 2, 2014, or August 13, 2014. No wheezing was observed at Children's Hospital on September 3, 2014; November 1, 2014; February

20

4, 2014; March 28, 2015; or December 5, 2015. By December 2015, L.L.L.'s parents reported some wheezing in the past.

Finally, the record also fails to show a growth impairment. On May 1, 2014, Dr. Bettencourt noted L.L.L. was gaining weight well. And in August 2014, Dr. Kanotra observed that L.L.L. was gaining weight, had no feeding issues, and was healthy with no apparent dysmorphic features. Neither the ALJ in his decision, nor the Commissioner in her brief, address L.L.L.'s weight-for-length measurements. Nonetheless, the Court can find no evidence in the record of three weight-for-length measurements in a twelve month period at least 60 days a part that are less than the third percentile. Thus, the Court finds that the ALJ's determination that L.L.L. does not meet Listing 103.03 is supported by substantial evidence.

To be found disabled under Listing 105.08, Growth Failure due to any digestive disorder, the claimant must show:

> A. Chronic nutritional deficiency present on at least two evaluations at least 60 days
> apart within a consecutive 12–month period documented by one of the following:
> 1. Anemia with hemoglobin less than 10.0 g/dL; or
> 2. Serum albumin of 3.0 g/dL or less;
> AND
> B. Growth failure as required in 1 or 2:
> 1. For children from birth to attainment of age 2, three weight-for-length
> measurements that are:
> a. Within a 12–month period; and
> b. At least 60 days apart; and
> c. Less than the third percentile on Table I or Table II;

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 105.08. The ALJ found that L.L.L. did not meet the listing because the medical evidence does not indicate chronic nutritional deficiency present on at least two evaluations at least 60 days apart within a consecutive 12-month period documented by one of the following: anemia with hemoglobin less than 10.0g/dL; or serum albumin of 3.0 g/dL or less and growth failure documented by three weight-for-length measurements that are within a 12

month period and at least 60 days apart and less than the third percentile on Table I or Table II.

The Court agrees. As noted above, the medical evidence indicates that L.L.L. was gaining weight.

There is no evidence of any nutritional deficiency. Thus, the Court finds that the ALJ's

determination that L.L.L. does not meet Listing 105.08 is supported by substantial evidence.

A finding of disability under listing 112.02 requires a showing of:

A. Medically documented persistence of at least one of the following:
    1. Developmental arrest, delay or regression; or
    2. Disorientation to time and place; or
    3. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
    4. Perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); or
    5. Disturbance in personality (e.g., apathy, hostility); or
    6. Disturbance in mood (e.g., mania, depression); or
    7. Emotional lability (e.g., sudden crying); or
    8. Impairment of impulse control (e.g., disinhibited social behavior, explosive temper outbursts); or
    9. Impairment of cognitive function, as measured by clinically timely standardized psychological testing; or
    10. Disturbance of concentration, attention, or judgment;
AND
B. Select the appropriate age group to evaluate the severity of the impairment:
    1. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the following:
        a. Gross or fine motor development at a level generally acquired by children no more than one-half the child's chronological age, documented by:
            (1) An appropriate standardized test; or
            (2) Other medical findings (see 112.00C); or
        b. Cognitive/communicative function at a level generally acquired by children no more than one-half the child's chronological age, documented by:
            (1) An appropriate standardized test; or
            (2) Other medical findings of equivalent cognitive/communicative abnormality, such as the inability to use simple verbal or nonverbal behavior to communicate basic needs or concepts; or
        c. Social function at a level generally acquired by children no more than one-half the child's chronological age, documented by:
            (1) An appropriate standardized test; or

(2) Other medical findings of an equivalent abnormality of social functioning, exemplified by serious inability to achieve age-appropriate autonomy as manifested by excessive clinging or extreme separation anxiety; or

d. Attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in two or more areas covered by a., b., or c., as measured by an appropriate standardized test or other appropriate medical findings.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.02. The ALJ referenced his analysis in the subsequent portions of his decision in concluding that L.L.L. did not meet the required criteria of a marked impairment in age-appropriate cognitive, social, or personal functioning or marked difficulties maintaining concentration, persistence, or pace.

As the Commissioner points out, the consultative examiner Dr. Hauck opined that L.L.L.'s adaptive skills were on track or mildly delayed, his social-emotional skills were very mildly delayed, and he showed a strength in cognitive skills despite a significant weakness in language skills. His motor skills were found to be on track. This supports the ALJ's finding that Listing 112.02 was not met. The functional equivalence analysis below also supports the ALJ's finding.

Accordingly, the ALJ's conclusion that L.L.L. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments is supported by substantial evidence.

b. *Conclusion that L.L.L. does not have an impairment or combination of impairments that functionally equals the severity of the alleged listing*

The ALJ determined that L.L.L. does not have an impairment or combination of impairments that functionally equals the severity of the alleged listing. As noted above, to satisfy functional equivalence, a claimant's impairment must result in a "marked" limitations in two of the six domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). Here, the ALJ found marked limitation in health and physical well-being, no limitation in the

domain of "moving about and manipulating objects," and less than marked limitation in the domains of the remaining four functional equivalence domains. Each of these six domains is discussed in turn.

    *1.   Acquiring and Using Information*

    The domain of "acquiring and using information" considers how well the child acquires or learns information and how well he uses the information he has learned. 20 C.F.R. § 416.926a(g). The regulations explain that older infants and toddlers,

> are learning about the world around [them]. When [they] play, [they] should learn how objects go together in different ways. [They] should learn that by pretending, [their] actions can represent real things. This helps [them] understand that words represent things, and that words are simply symbols or names for toys, people, places, and activities. [They] should refer to [themselves] and things around [them] by pointing and eventually by naming. [They] should form concepts and solve simple problems through purposeful experimentation (e.g., taking toys apart), imitation, constructive play (e.g., building with blocks), and pretend play activities. [They] should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions.

20 C.F.R. § 416.926a(g)(2)(ii). The regulations provide the following list of examples of limited functioning,

> (i)  [The child does] not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.
> (ii) [The child] cannot rhyme words or the sounds in words.
> (iii) [The child has] difficulty recalling important things [the child] learned in school yesterday.
> (iv) [The child has] difficulty solving mathematics questions or computing arithmetic answers.
> (v) [The child talks] only in short, simple sentences and [has] difficulty explaining what [he or she means].

Id. § 416.926a(g)(3). The examples are non-exclusive and do not necessarily describe a "marked" or "extreme" limitation. Id.

The ALJ's determination that L.L.L. has less than marked limitation in the domain of "acquiring and using information" is supported by substantial evidence. The ALJ considered that the consultative examination revealed mildly limited adaptive skills. The ALJ also considered that L.L.L.'s mother testified that he understands her words half of the time. The ALJ further considered that in April 2015, L.L.L. was assessed with cognitive skills in the low average range. The Court notes that the same Early Steps evaluation also noted that L.L.L. had below age level skills in communication and adaptive domains. That report further noted that L.L.L. could pay attention during conversation, respond to tone of voice, and could follow some visual directions with lots of visual cues, although he was not yet following direction consistently. As the Commissioner points out, the consultative examiner in October 2014 noted that L.L.L. was developing at or close to his age as corrected for prematurity in cognitive and adaptive skills. Dr. Willis, who examined L.L.L. for breath holding episodes, reported that L.L.L. was neurologically intact and had normal language, knowledge, and memory for his age. The Early Steps Report from May 2016 indicated only mild developmental delay in adaptive skills and cognition. The Court finds that substantial evidence supports the ALJ's determination that L.L.L. has less than marked limitation in the domain of "acquiring and using information."

    *2. Attending and Completing Tasks*

The domain of "attending and completing tasks" involves consideration of how well a child focuses and maintains attention and how well he begins, carries through, and finishes activities, including the pace of performance and the ease with which he changes activities. 20 C.F.R.§ 416.926a(h). The regulations explain that older infants and toddlers,

> should be able to attend to things that interest [them] and have adequate attention to complete some tasks by [themselves]. [Toddlers] should demonstrate sustained attention, such as when looking at picture books, listening to stories, or building with blocks, and when helping to put on [their] clothes.

Id. § 416.926a(h)(2)(ii). The regulations provide the following non-exclusive list of examples of limited functioning in attending and completing tasks.

> (i) [The child is] easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
> (ii) [The child is] slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
> (iii) [The child] repeatedly become[s] sidetracked from your activities or [the child] frequently interrupt[s] others.
> (iv) [The child is] easily frustrated and give[s] up on tasks, including ones [the child is] capable of completing.
> (v) [The child requires] extra supervision to keep you engaged in an activity.

Id. § 416.926a(h)(3).

The ALJ's determination that L.L.L. had less than marked limitation in "attending and completing tasks" is supported by substantial evidence. In making this finding, the ALJ considered that the Early Steps evaluation found L.L.L. had not yet developed the ability to follow directions consistently or pay attention to longer portions of communication. The ALJ further considered that the consultative examiner opined that L.L.L. would have difficulty staying on task for an age-appropriate amount of time. But, the ALJ also considered that the Early Steps evaluation found L.L.L. was able to pay attention to conversation and follow simple directions. The Commissioner also points out that the record indicates that L.L.L. could remove clothing like socks, hats, shoes, or mittens. R. at 345. Indeed, the May 2016 Early Steps report notes that L.L.L. could remove socks and shoes independently and displayed moments of independence when motivated to complete a task. The Court finds that the ALJ's finding that L.L.L. has less than marked limitation in "attending and completing tasks" is supported by substantial evidence.

    *3. Interacting and Relating with Others*

The domain of "interacting and relating with others," concerns the child's ability to initiate and sustain emotional connections with others, develop the use of language, cooperate with others,

comply with rules, respond to criticism, and respect and take care of the possessions of others. 20

C.F.R. § 416.926a(i). The regulations explain that older infants and toddlers:

> are dependent upon [their] caregivers, but should begin to separate from them. [They] should be able to express emotions and respond to the feelings of others. [They] should begin initiating and maintaining interactions with adults, but also show interest in, then play alongside, and eventually interact with other children [their] age. [They] should be able to spontaneously communicate [their] wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know you can understand what [they] say most of the time.

Id. § 416.926a(i)(2)(ii). The regulations provide the following examples of limited functioning in

interacting and relating with others:

> (i) [The child does] not reach out to be picked up and held by your caregiver.
> (ii) [The child has] no close friends, or [the child's] friends are all older or younger than [the child].
> (iii) [The child] avoid[s]or withdraw[s] from people [the child] know[s], or [the child is] overly anxious or fearful of meeting new people or trying new experiences.
> (iv) [The child has] difficulty playing games or sports with rules.
> (v) [The child has] difficulty communicating with others; e.g., in using verbal and nonverbal skills to express [himself or herself], carrying on a conversation, or in asking others for assistance.
> (vi) [The child has] difficulty speaking intelligibly or with adequate fluency.

Id. § 416.926a(i)(3). The list is not exclusive and does not necessarily describe a "marked" or

"extreme" limitation. Id.

The ALJ's finding that L.L.L. had less than marked limitation in "interacting and relating

with others" is supported by substantial evidence. In making this finding the ALJ considered that

L.L.L.'s mother testified that he does not interact with other kids. The ALJ also considered the

Bayley test performed by the consultative examiner, which revealed a mild delay in social skills.

The ALJ further considered the consultative examiner's findings that L.L.L. maintained adequate

eye contact and his social interactions were age-appropriate. But, the ALJ noted that the

consultative examiner found L.L.L. exhibited language delay. The ALJ also considered the April

2015 Early Steps report, which found L.L.L. had average social skills. As the Commissioner points

out, the consultative examiner also opined that L.L.L. would be able to engage in age-level social interchanges as long as he was breathing well. Further, the Court notes that L.L.L.'s pediatrician Dr. Bettencourt filled out a Functional Assessment form assigning L.L.L. less than moderate impairment in "interacting and relating with others." Dr. Bettencourt noted that L.L.L. was shy, afraid of other people, and did not like to play with children he does not know. Although some findings and observations supported a marked limitation, the Court finds that the ALJ's determination that L.L.L. had less than marked limitation in "interacting and relating with others" is supported by substantial evidence.

4. *Moving About and Manipulating Objects.*

The domain of "moving about and manipulating objects" concerns how well the child moves his body from one place to another and how he moves and manipulates things. Id. § 416.926a(j). The regulations explain that older infants and toddlers:

> should begin to explore actively a wide area of [their] physical environment, using [their bodies] with steadily increasing control and independence from others. [They] should begin to walk and run without assistance, and climb with increasing skill. [They] should frequently try to manipulate small objects and to use [their] hands to do or get something that [they] want or need. [Their] improved motor skills should enable [them] to play with small blocks, scribble with crayons, and feed [themselves].

Id. § 416.926a(j)(2)(ii). The regulations provide the following non-exclusive list of examples of limited functioning in the domain of "moving about and manipulating objects:"

> (i) [The child] experience[s] muscle weakness, joint stiffness, or sensory loss (e.g., spasticity, hypotonia, neuropathy, or paresthesia) that interferes with [the child's] motor activities (e.g., [he or she] unintentionally drop things).
> (ii) [The child has] trouble climbing up and down stairs, or [has] jerky or disorganized locomotion or difficulty with [his or her] balance.
> (iii) [The child has] difficulty coordinating gross motor movements (e.g., bending, kneeling, crawling, running, jumping rope, or riding a bike).
> (iv) [The child has] difficulty with sequencing hand or finger movements.
> (v) [The child has] difficulty with fine motor movement (e.g., gripping or grasping objects).

28

(vi) [The child has] poor eye-hand coordination when using a pencil or scissors.

Id. § 416.926a(j)(3). The examples do not necessarily describe a "marked" or "extreme" limitation.

The ALJ's finding that L.L.L. has no limitation in the domain of "moving about and manipulating objects" is supported by substantial evidence. In coming to this conclusion, the ALJ considered the results of the Bayley test performed by the consultative examiner, when L.L.L. obtained a motor score of 90, indicating no limitation. Indeed, the Court notes the consultative examiner's finding that L.L.L.'s motor skills were on track. The ALJ also considered the April 2015 Early Steps report which found L.L.L. could throw objects, use a pincer grasp, and drop with purpose. That report also noted that L.L.L. could pull up to stand and walk, although he was not yet standing or walking independently for long periods. L.L.L. was a little over one year old at that time. The Court does note that the May 2016 Early Steps report, which was not before the ALJ but does concern the relevant time period and was before the Appeals Council,[2] recommended continued support in the area of physical mobility and fine motor skills. But that report also noted that L.L.L. could remove his socks and shoes independently. Dr. Bettencourt's Functional Assessment found L.L.L. had an impairment of less than moderate in "moving about and manipulating objects." Although there is some evidence of impairment,[3] the Court finds that the ALJ's conclusion that that L.L.L. has no limitation in moving about and manipulating objects is supported by substantial evidence.

---

[2] As noted above, the Appeals Council found the Early Steps evidence submitted to it after the hearing before the ALJ did "not show a reasonable probability that it would change the outcome of the decision." R. at 2.

[3] To the extent the record could also support a finding of "less than marked limitation," the ALJ's failure to make this finding is harmless error.  Had the ALJ found so here, L.L.L. would still not have been found disabled because, as noted above, such a finding would require at least a marked limitation in two domains or an extreme limitation in one.

*5. Caring for Yourself*

The domain of "caring for yourself" concerns how well the child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he takes care of his own health, possessions, and living area. Id. § 416.926a(k). The regulations explain that older infants and toddlers:

> should be trying to do more things for [themselves] that increase [their] sense of independence and competence in [their] environment. [They] might console [themselves] by carrying a favorite blanket with [them] everywhere. [They] should be learning to cooperate with [their] caregivers when they take care of your physical needs, but [they] should also want to show what [they] can do; e.g., pointing to the bathroom, pulling off your coat. [They] should be experimenting with [their] independence by showing some degree of contrariness (e.g., "No! No!") and identity (e.g., hoarding [their] toys).

Id. § 416.926a(k)(2)(ii). The regulations provide the following non-exclusive examples of limitations in the domain of "caring for yourself:"

> (i) [The child] continue[s] to place non-nutritive or inedible objects in [his or her] mouth.
> (ii) [The child] often use[s] self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or [the child has] restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
> (iii) [The child does] not dress or bathe [himself or herself] appropriately for [his or her] age because [the child has] an impairment(s) that affects this domain.
> (iv) [The child] engage[s] in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or [the child] ignore[s] safety rules.
> (v) [The child does] not spontaneously pursue enjoyable activities or interests.
> (vi) [The child has] disturbance in eating or sleeping patterns.

Id. § 416.926a(k)(3). The examples do not necessarily describe an "extreme" or "marked" limitation. Id.

The ALJ's finding that L.L.L. has less than marked limitation in the domain of "caring for yourself" is supported by substantial evidence. The ALJ considered that the results of the

consultative examination indicated that L.L.L. made noises that did not appear to be language and his emotional skills were mildly delayed. L.L.L. was unable to walk or stand for long periods, but could walk for shorter periods. The ALJ also considered that L.L.L. was evaluated for breath holding episodes, but that these episodes were determined to be neurologically normal. The Commissioner points to other record evidence supporting the ALJ's decision, including the April 2015 Early Steps report showing that L.L.L. could take some foods from a spoon, suck and swallow well, and hold his own bottle, although he was not yet feeding himself with his hands. The same report also noted that L.L.L. was able to play independently and explore his area. The Court notes that the May 2016 Early Steps report notes that L.L.L. could remove his socks and shoes independently.  The Court finds the ALJ's determination that L.L.L. has less than marked limitation in the domain of "caring for yourself" is supported by substantial evidence.

   *6. Health and Physical Well Being*

   The domain of health and physical well-being considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the child's functioning that were not considered in the "moving about and manipulating objects" domain. Id. § 416.926a(l). The regulations provide the following examples of limitations in health and physical well-being:

   (i) [The child has] generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of [the child's] impairment(s).
   (ii) [The child has] somatic complaints related to [his or her] impairments (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia).
   (iii) [The child has] limitations in [his or her] physical functioning because of [the child's] treatment (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments).
   (iv) [The child has] exacerbations from one impairment or a combination of impairments that interfere with [the child's] physical functioning.

(v) [The child is] medically fragile and need[s] intensive medical care to maintain [the child's] level of health and physical well-being.

<u>Id.</u> § 416.926a(l)(4). As in the other domains, the list is non-exclusive and does not necessarily describe "marked" or "extreme" limitations. <u>Id.</u>

The ALJ's finding that L.L.L. has marked limitation in the domain of "health and physical well-being" is supported by substantial evidence. The ALJ considered that L.L.L. has had laryngomalacia as well as episodes of difficulty breathing since birth. The ALJ also noted that L.L.L.'s growth has been slow, with weight and length between the third and fifth percentiles. The ALJ also noted that L.L.L. has received emergency treatment for shortness of breath, secondary to upper respiratory infections. The ALJ further considered that during the consultative examination, the examiner noted that L.L.L. had labored and loud breathing, had low energy, and required Albuterol treatments. But the ALJ also considered that L.L.L.'s condition appeared to improve somewhat with medication, therapy, and nebulizer use. The Commissioner points to other record evidence supporting the ALJ's decision, including Dr. Kanotra's observation in August 2014 that L.L.L. was healthy with no apparent dysmorphic features and Dr. Willis's observation that L.L.L. had normal strength and coordination. The Court notes that in the Functional Assessment, Dr. Bettencourt determined that L.L.L. had moderate limitation in the category of "health and physical well-being." The Court finds that the ALJ's decision that L.L.L. has marked limitation in the domain of "health and physical well-being" is supported by substantial evidence.

       7.  *Functional Equivalence Conclusions*

The ALJ concluded that L.L.L. has a marked limitation in "health and physical well-being," no limitation in "moving about and manipulating objects," and less than a marked limitation in "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "caring for yourself." As described above, the Court has found these conclusions

are supported by substantial evidence. Accordingly, the ALJ's conclusion that L.L.L. does not functionally meet a listed impairment because he does not have a marked limitation in at least two domains, nor an extreme limitation in one domain, is supported by substantial evidence.

<u>Conclusion</u>

For the foregoing reasons, the undersigned that the ALJ's determination that L.L.L. is not disabled under the Act must be affirmed.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 12) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 13) be GRANTED. It is further RECOMMENDED that the Motion to Submit New Evidence (Rec. Doc. 14) be DENIED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 20th day of July, 2018.


_____
Janis van Meerveld
United States Magistrate Judge

33